UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
v.                                )          Docket No.   18-cr-10087-FDS
                                  )
DI'LON SMITH                      )
DENZEL SMITH                      )

## **DEFENDANTS' MOTION TO SUPPRESS EVIDENCE**

Di'lon Smith and his brother Denzel Smith have been charged with Felon in Possession of a

Firearm and Ammunition (Count One), Possession with Intent to Distribute 100 grams or more of a

cyclopropyl fentanyl, a controlled substance analogue (Count Two), Possession with Intent to

Distribute fentanyl (Count Three), and Possession of a Firearm in Furtherance of a Drug Trafficking

Crime (Counts Four and Five). This indictment arises from the November 29, 2017 execution of a

search warrant on the rear basement apartment of 177 Megan Road, Hyannis, Massachusetts, a

location subsequently determined to be leased by Di'lon Smith. At the time of the warrant's execution

police also searched a Honda Civic registered to Denzel Smith's girlfriend, Chloe Wright that was

parked in the driveway of 177 Megan Road. Because the search of this vehicle exceeded the scope of

the search warrant and was not justified by any exception to the warrant requirement, the evidence

obtained from the Honda Civic must be suppressed.

## **STATEMENT OF FACTS**

On November 28, 2017 the Barnstable District Court issued a warrant authorizing the

search of the basement apartment area of 177 Megan Road in Hyannis for fentanyl and related

materials. *See* Barnstable District Court search warrant 17SW125, attached as Exhibit A. Barnstable

Detective Peter Ginnetty wrote the affidavit in support of the search warrant application. *See*

Affidavit of Peter H. Ginnetty, attached as Exhibit B. It stated that the Barnstable and Yarmouth

police departments had initiated an investigation into Di'lon and Denzel Smith in the late summer/ early fall after overdose victims told them that the Smith brothers were distributing fentanyl. Exh. B at ¶ 1. In October 2017 Barnstable detectives spoke to two confidential sources, CS1 and CS2. CS1 stated that he or she had recently purchased heroin and fentanyl from Denzel Smith in the mid-Cape area. CS2 stated that he or she had recently purchased fentanyl from Di'lon Smith in the Hyannis area. Each confidential source said that the brother he or she had dealt with "conduct[ed] drug transactions away from his primary residence" and met their customers at various locations either in the Mid-Cape or Hyannis areas. Exh. B at ¶ 2, 3.

During October 2017 Detective Ginnetty observed Di'lon Smith drive his car (a blue BMW) to 177 Megan Road, pull into the driveway, exit and enter the fenced area of the rear of the property for "a lengthy period of time." According to the affidavit, "Detectives began monitoring 177 Megan Road Hyannis MA and have observed Di'lon entering/exiting from the fenced/rear of the property. Di'lon Smith has subsequently been followed by BPD detectives to various spots where they have observed him conducting short term meetings with individuals and immediately returning back to 177 Megan Road, Hyannis, MA." Exh. B at ¶ 5. Detective Ginnetty also stated that he observed Di'lon Smith engage in techniques typical of a person looking to see if they were being followed, such as driving past the address before stopping and looking up and down the street prior to entering the fenced-in back yard. Ginetty averred that "training and experience leads this detective to believe that Di'lon is utilizing 177 Megan Rd. Hyannis MA as a 'stash/trap' house." *Id.*

During the month of November 2017, Detective Ginnetty heard from a member of the Yarmouth Police Department that a confidential source (CS3) told the Yarmouth detective that Di'lon Smith had recently moved into 177 Megan Rd and was using the residence as a stash location for his narcotics. According to the affidavit, CS3 advised that Di'lon Smith enters the residence

through a door to the rear of the house and he rents the basement area of the residence. Exh. B at ¶ 6.

In November 2017 investigators set up two controlled buys: one conducted by CS1 from Denzel Smith, and one conducted by CS2 from Di'lon Smith. Exh. B ¶ 7, 8. In the first controlled buy, investigators observed Denzel Smith leave 177 Megan Road in a dark blue Chevrolet Impala, drive to the meet location and meet with CS1 in that car. Exh. B ¶ 7. This surveillance took place "during the week of November 18." *Id.*[1] In the second controlled buy, investigators observed Di'lon Smith leave 177 Megan Road in a blue BMW, drive to the meet location and meet with CS2. Exh. B ¶ 8. This surveillance took place within seventy-two hours of the affidavit's submittal. *Id.*[2]

**The Search Warrant:**

The search warrant authorized a search of "[t]he basement apartment area of 177 Megan Road Hyannis MA" and "on the person or in the possession of Di'lon Smith and Denzel Smith." The warrant declined to authorize the search of "any person present who may be found to have such property in his or her possession or under his or her control." The warrant did not use the term "premises," "property," or any other generalized term and a description of the area to be

---

[1] Denzel Smith was the registered owner of the Chevrolet Impala (MA9BBC30). On November 17, 2017 the Barnstable Police Department applied for a search warrant to install a GPS transmitter on this car, citing two controlled buys from Denzel Smith in which the transactions were conducted inside the Impala. The affiant justified the need for the GPS warrant, stating "I have been unable to determine where Denzel Smith meets his source of supply or where he stores his drugs through conventional surveillance and/or other investigative means." The warrant was granted and the GPS tracking device was installed on November 20th. The search warrant application for 177 Megan Road did not include any tracking information from this GPS device.

[2] Barnstable police also obtained a warrant to install a GPS tracker on Di'lon Smith's blue BMW (MA 6ZF699). The tracking device was installed beginning on November 26 through November 29. The search warrant application for 177 Megan Road did not include any tracking information from this GPS device.

searched did not extend to the curtilage or any outside areas. Exh. A.

**Execution of the warrant:**

On November 29th the Barnstable Police Department and ATF agents executed the warrant at 177 Megan Road. At 10:53 a.m. Detective Ginnetty observed Denzel Smith, Di'lon Smith, and another man ("MM") leave Di'lon Smith's apartment at 89 Lewis Bay Road in a black Honda Civic (MA 191RN4) registered to Denzel's girlfriend, Chloe Wright. At 11:40 a.m. he saw the Honda Civic arrive at 177 Megan Road. Denzel Smith parked the car in the driveway and the three men exited the car, walked through the gated backyard to the rear of the building, and entered the rear basement apartment.

Through the use of a camera installed on the property, police monitored the backyard and rear apartment door until approximately 2:00 p.m. At 2:00 p.m. "AS" arrived in Di'lon Smith's BMW and entered the rear basement apartment. At 2:07 all four people exited the rear basement apartment and walked from the fenced-in backyard to the front of the residence. At 2:08 police executed the search warrant when they observed Denzel Smith "attempting to enter the driver's door of MA Reg. 191RN4" and AS standing next to Di'lon's BMW, presumably about to leave the premises. Five BPD officers approached the address, encountered the subjects in the driveway area, identified themselves as police officers, and announced they had a search warrant. According to the report, "AS, Denzel Smith and Di'lon Smith were secured without incident," while MM ran through the backyard, climbed over the fence at the rear of the property, and was subsequently tased and apprehended.

After all the subjects were secured officers spoke with Di'lon Smith, and then with Denzel Smith. They then recovered the keys to Chloe Wright's Honda Civic from Denzel Smith's pocket and searched her car. Inside the trunk they found a black backpack containing paperwork, a grinder

with residue, blue gloves, 1000 gram bag of Mannitol, plastic baggies, a brown powdery substance

which field tested positive for MDMA, and an empty black box that investigators subsequently

determined was a case for a metallic narcotic press.[3]

## LEGAL ARGUMENT

The Fourth Amendment states in pertinent part that no search warrant shall issue unless it

"particularly describ[es] the place to be searched, and the ... things to be seized." U.S. Const. amend.

IV. The authority to search granted by a warrant is limited by the particular places delineated in the

warrant and does not extend to additional areas. *See, e.g., United States v. Smith*, 533 F.Supp.2d 227,

231 (2008) (citing *United States v. Bonner*, 808 F.2d 864, 868 (1st Cir. 1986)). A warrantless search or

seizure is presumptively unreasonable and will be upheld only if an exception to the warrant

requirement applies. The government bears the burden of proving the lawfulness of the search.

*Mincey v. Arizona*, 437 U.S. 385, 390-91 (1978).

I.    **The search of the Honda Civic was outside the scope of the search warrant.**

The search warrant in this case authorized a search of "the basement apartment area of 177

Megan Road Hyannis MA." It did not authorize the search of any vehicles on the property. Nor did

it use the word "premises," "property," "curtilage," or any other wording to indicate that the scope

of the warrant encompassed the entirety of the property. As such, this case is nearly identical to

*United States v. Smith*, in which the District Court (Gorton, J.) held that a warrant authorizing a search

of a specific apartment in a two-family house did not include within its scope authorization to search

a vehicle parked in the driveway that was registered to the defendant's sister, but driven by

defendant. *Smith*, 533 F.Supp.2d at 231. Although the government had cited numerous cases for the

---

[3] Investigators found a narcotic press that appeared to fit inside the black box during the search of
177 Megan Road.

proposition that a vehicle parked within a driveway is within the scope of a search warrant, the court

distinguished those cases, all of which involved warrants authorizing a search of the entire premises,

rather than an individual apartment within the property:

> The government cites numerous cases for the proposition that a vehicle parked in a driveway is within the scope of a search warrant for the residence, but all of those cases involve warrants issued for 'premises' or 'property,' not a specific unit within an apartment building. The warrant for Smith's apartment was limited to the second floor of the two-family house in question and did not permit a search of the 'premises' or 'property' at a certain address. *Cf. United States v. Asselin*, 775 F.2d 445 (1st Cir. 1985) . . . The Government cites no authority, and this Court has found none to indicate that all search warrants for a particular residence include within their scope authorization to search the entire premises. In fact, warrants often specify that curtilage and/or motor vehicles may be searched, indicating that such areas or items are not automatically included within the scope of a warrant for a residence . . . Because the warrant in this case was limited to the Apartment itself, it did not include property outside the Apartment and thus the warrant did not authorize the search of the nearby Mazda.

*Smith*, 533 F.Supp.2d at 231. This case is identical. The warrant specifically authorized only the

search of the "basement apartment area" based upon the representation in the affidavit that CS3 had

told a Yarmouth police officer that Di'lon Smith had recently moved into the basement apartment

area. Indeed, based on the affidavit the warrant must be so limited, as the affidavit provided no

information about who owned the property, who leased the property to Di'lon Smith, or who else

lived in main apartment of the house. The affidavit provided the magistrate with no information to

suggest that evidence of any crimes could be found anywhere other than the basement apartment

that CS3 stated Di'lon Smith "had recently moved into."[4]  As such, no search outside of this

basement area *could* be authorized.

## II.    The "automobile exception" to the warrant requirement is inapplicable.

---

[4] Discovery reveals that Detective Ginnetty did not actually obtain the lease agreement between Di'lon Smith and his landlord until March 29, 2018, four months after the arrest.

6

In addition, the "automobile exception" to the warrant requirement is inapplicable here. As the Supreme Court stated in *Coolidge v. New Hampshire*, 403 U.S. 443, 461 (1971) "the word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." There, the Court was careful to draw constitutional distinctions based upon the location of the automobile:

> It seems abundantly clear that there is a significant constitutional difference between stopping, searching, and seizing a car on the open highway, and entering private property to seize and search an unoccupied, parked vehicle not then being used for any illegal purpose.

*Coolidge*, 403 U.S. at 663 n.20. In *Coolidge*, a plurality of the Court held that the automobile exception did not apply to a vehicle parked in a private driveway. The First Circuit noted in 2011 that the argument that the automobile exception does not apply to a vehicle parked in a private driveway is a "significant unresolved issue." *United States v. Goncalves*, 642 F.3d 245, 250 (1st Cir. 2011).

The First Circuit appears to only have confronted the issue twice, in both cases upholding the search of a car under the automobile exception after police had both developed probable cause to search the specific vehicle and had also pursued that vehicle from a public street onto private property. *See United States v. Moscatiello*, 771 F.2d 589, 599 (1st Cir. 1985) ("In sharp contrast to the facts in Coolidge, here the agents who arrested [defendant] searched the truck immediately after pursuing the defendant to the garage site on the reasonable belief that it contained contraband."); *Goncalves*, 642 F.3d at 251 & n.4 (upholding search on plain error review, citing *Moscatiello*, and noting that "[h]ere, it would be enough for us to uphold the search under the automobile exception on the grounds that Goncalves had tried to flee with a car known to be used for carrying drugs, and had been chased into a driveway, and then had fled so that probable cause certainly existed to believe

7

that the car contained contraband and, quite possibly, a weapon.").5

Regardless of the extent of the automobile exception's application to a car parked in a private driveway, the exception cannot apply where there is no probable cause to search the vehicle in question. *Ramirez-Rivera*, 800 F.3d at 30-31. In order for probable cause to exist, the officer must have reasonably trustworthy information of supporting facts and circumstances such as would persuade a person of reasonable caution to believe the search is justified. *United States v. Infante-Ruiz*, 13 F.3d 498, 502 (1st Cir. 1994). "[T]he existence of probable cause relating to general criminal activity is not sufficient to justify a warrantless search or seizure of an automobile. The criminal activity must somehow be linked to the motor vehicle in question." *United States v. Gunning*, 405 F.Supp.2d 79, 83 (D. Mass. 2005) (allowing motion to suppress because, although police had probable cause relating to general criminal activity, that was not sufficient to justify warrantless search or seizure of defendant's automobile). There is no probable cause to believe that evidence of any crime can be found in the Honda Civic.

According to surveillance reports provided in the discovery, police had seen the Honda Civic exactly three times previously. On October 3, 2017 police observed Denzel Smith "arrive at the

---

5 The reach of the automobile exception to an automobile parked on private property is even less clear now than when these cases were decided. *See United States v. Ramirez-Rivera*, 800 F.3d 1 (1st Cir. 2015) (reversing district court's denial of motion to suppress due to a lack of probable cause and stating in dicta that "the so-called 'automobile exception' to the Fourth Amendment does nothing to save the search of [defendant's] car assuming the exception even applies to a car parked within the curtilage of a defendant's home, as was the case here")*; Collins v. Virginia*, 138 S.Ct. 1663, 1671 & 1674 (2018) (holding that automobile exception to the warrant requirement does not justify warrantless invasion of the curtilage of a home to approach and inspect vehicle). It is notable that the majority opinion in *Collins* distinguished *Scher v. United States*, 305 U.S. 251 (1938), a case factually similar to *Moscatiello* and *Goncalves* as being "ground in multiple doctrines, particularly, and perhaps most appropriately, hot pursuit."

Barnstable District Court in MA Reg 191RN4." The car subsequently stopped at 89 Lewis Bay

Road, Di'lon's address, where Denzel entered and later exited, returned to the civic and then left the

area. The surveillance reports on this occasion do not detail whether Denzel was alone,

accompanied by Chloe Wright, or any other observations. On November 15, 2017 Deputy Salidino

of the Barnstable Police Department observed "two black males standing around [the Honda Civic]

behind 33 Fresh Holes Road." Three minutes later he observed Denzel Smith "operating MA Reg

191RN4" and approximately 30 minutes later he observed the vehicle "at 177 Megan Road." No

additional information is given. Finally, on November 16 Deputy Salidino observed Denzel Smith

"operating" the civic on Bearses Way. At 12:35 he observed "Denzel and another black male

standing outside the Honda Civic." No location is given. He noted that "Chloe hasn't been observed

with Denzel today." At 1:37 he observed the Honda Civic parked at 177 Megan Road along with

Di'lon's BMW. Finally at 2:34 Deputy Salidino observed Denzel Smith "looking up and down the

street before placing an item in the trunk area," of the Honda Civic, entering the Civic and driving

away toward Bearses Way. *See* Surveillance Reports, attached as Exh. C.

These observations are not sufficient to establish probable cause that contraband or

evidence would be found in the Honda Civic. Police developed no information from any

confidential sources that Denzel Smith conducted any drug transactions using the Civic, nor did they

observe any such transactions. Observations of Denzel and "another black male standing outside

the Honda Civic" or Denzel "looking up and down the street before placing an item in the trunk"

are generic and do not provide probable cause, even if police subjectively *suspected* that Smith was

engaging in drug transactions or putting evidence in the trunk. *See, e.g. Smith*, 533 F.Supp.2d at 234

(the fact that police observed the defendant exit the Mazda on the day of the raid and approach a

silver car in his driveway was insufficient to provide probable cause to search the Mazda, where

detective said that he believed he was witnessing a drug deal but did not actually see an exchange). In any case, the observations were innocuous enough that police did not even attempt to obtain a GPS warrant to track this vehicle, unlike other vehicles that the defendants' owned.[6]

In addition, neither the fact that police had observed Denzel Smith drive a different vehicle, his Chevrolet Impala, to a controlled buy "during the week of November 18" (Exh. B ¶7) nor the fact that police seized contraband inside the apartment during the execution of the warrant provide probable cause to believe that the Honda Civic also contained items of evidentiary value. "The finding of contraband in one location frequented by the defendant does not, however, establish probable cause that contraband will be found in every location frequented by the defendant." *Smith*, 533 F.Supp.2d at 235 (rejecting government's argument that evidence found inside Smith's apartment made it probable that additional contraband would be found inside his sister's Mazda, which he was driving); *See also Id.* (citing *United States v. Hogan*, 25 F.3d 690, 694 (8th Cir. 1994) (holding that information that defendant drove a truck to work where he distributed drugs and discovery of small amount of marijuana, two scales, weapons, a police scanner and $5,000 in cash during search of his home did not establish probable cause to search a second automobile owned by defendant)).

## **CONCLUSION**

Defendant respectfully requests that this Honorable Court suppress the evidence found inside the trunk of the Honda Civic parked at 177 Megan Road and schedule an evidentiary hearing

---

[6] Barnstable police applied for a warrant to install a GPS tracker on Denzel Smith's Chevrolet Impala on November 17 and a warrant to install a GPS tracker on Di'lon Smith's BMW on November 22.

on this Motion.


Respectfully submitted,

| | |
|---|---|
| DI'LON SMITH, a/k/a DILON SMITH, | DENZEL SMITH |
| By his attorney, | By his attorney, |
| */s/ Jessica D. Hedges* | */s/ W. Jamiel Allen* |
| | |
| JESSICA D. HEDGES | W. JAMIEL ALLEN |
| BBO# 645847 | AZ Bar # 024631 |
| Hedges & Tumposky LLP | **Assistant Federal Public Defender** |
| 50 Congress Street, Suite 600 | 51 Sleeper Street, 5th Floor |
| Boston, MA 02109 | Boston, MA 02210 |
| (617) 722-8220 | 617-223-8061 |
| hedges@htlawyers.com | Jamiel_Allen@fd.org |


<u>CERTIFICATE OF SERVICE</u>

I, W. Jamiel Allen, Esquire, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on February 25, 2019.

*/s/ W. Jamiel Allen*
W. Jamiel Allen