UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSTTS

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | Docket: 1:18-CR-10087-FDS |
| v. | ) | |
| | ) | |
| DI'LON SMITH, | ) | |
| DENZEL SMITH, | ) | |
| Defendants | ) | |
| | ) | |

**DEFENDANT DI'LON SMITH'S MOTION TO SUPPRESS ALL EVIDENCE DERIVED FROM THE EXECUTION OF A SEARCH WARRANT AT 177 MEGAN ROAD AND INCORPORATED MEMORANDUM OF LAW**

The Defendant, Di'lon Smith, respectfully moves this Honorable Court to suppress all evidence obtained from the execution of a search warrant at 177 Megan Road, Hyannis, Massachusetts ("177 Megan Rd."). In support of his motion, the Defendant submits this memorandum of law.

## FACTS

Di'lon Smith and his brother, Denzel, were arrested following the execution of a search warrant on November 29, 2017 of a basement apartment at 177 Megan Road, in Hyannis. Police seized two firearms and ammunition, as well as several bags of suspected fentanyl[1] from the apartment. Both have been charged with one count of Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1) and § 2, and the government has intimated that it may seek further charges under the Analogue Act, 21 U.S.C. § 813 and/or 18 U.S.C. 924(c).

---

[1] The substance was later determined to be "cyclopropyl fentanyl," which was at that time an unscheduled substance. *See* 83 Federal Register 469-01 (January 4, 2018). A small amount of a substance alleged to be heroin was also seized.

In service of an investigation which began in September of 2017, law enforcement secured multiple search warrants from Barnstable District Court during late November of 2017. The search warrants included GPS warrants for the Smith brother's respective cars, and search warrants for the Megan Road property and 89 Lewis Bay Road, Hyannis, and 321 Mitchell's Way, Hyannis, - the residences of Di'lon and Denzel Smith's girlfriends, respectively.[2]

Specific to the application for 177 Megan Rd., Det. Ginnetty averred that the Yarmouth and Barnstable departments began investigating the Smith brothers in late summer to early autumn of 2017, based in part on the departments' prior knowledge of the defendants, as well as rumors officers began encountering from "overdose victims" and confidential sources that the brothers were selling fentanyl in the area. *Affidavit of Peter H. Ginnetty*, at ¶ 1.[3] In October, 2017, two of Ginnetty's colleagues, Detectives Meaghan Cunningham and Thomas Chevalier, met with a Barnstable PD confidential source ("CS1") who informed them that Denzel Smith was selling large amounts of heroin or fentanyl/heroin on the Mid-Cape. Id. at ¶ 2. CS1 alleged that he was familiar with Denzel, having previously purchased heroin and heroin/fentanyl from him, and said that Smith was selling the drugs for roughly $100 per gram, but was also selling larger volumes as well. Id. CS1 told the investigators that Denzel conducted his sales away from his primary home. Id. As a user and seller of narcotics himself, CS1 was regarded as familiar with the logistics and jargon of the drug trade and was willing to buy from Denzel Smith on

---

[2] In order of issuance, the warrants were:
1. GPS tracking warrant for Denzel Smith's Chevrolet Impala, on Nov. 17, 2017, applied for by Barnstable PD Det. Meaghan Cunningham. The device was installed on the car on Nov. 20th.
2. GPS tracking warrant for Di'lon Smith's BMW 740IA on Nov. 22, 2017, applied for by Barnstable PD Det. Peter Ginnetty. The device was installed on Nov. 26th.
3. Search Warrant for 89 Lewis Bay Rd., Apt. 209, Hyannis on Nov. 28, 2017, applied for by Barnstable PD Det. David Foley.
4. Search Warrant for 177 Megan Rd., Hyannis on Nov. 28, 2017, applied for by Det. Ginnetty.
5. Search Warrant for 321 Mitchell Way, Hyannis, on Nov. 29, 2017, applied for by Barnstable PD Det. Thomas Chevalier.

[3] The Affidavit is attached as *Exhibit A*.

behalf of the Barnstable Police. Id. Though the detectives claimed personal familiarity with CS1, it does not appear that CS1 had contributed in any previous investigations. Id.

During the same month, Det. Ginnetty interviewed one of his own sources, ("CS2"). Id. at ¶ 3. CS2 reiterated virtually identical allegations, concerning sales, volume, pricing[4], and conducting transactions away from the primary residence, except with regard to Di'lon Smith, rather than Denzel. Id. CS2 was also familiar with the argot and practices of drug dealing, as CS2 was also both a drug user and seller. Id. CS2 was also willing to buy from Di'lon Smith in furtherance of Barnstable 's investigation. Id. Det. Ginnetty was personally familiar with CS2, and noted that CS2 was "reliable", as the source had previously assisted the Barnstable PD in securing a search warrant that resulted in the arrest and conviction of one individual, as well as the confiscation of narcotics and a firearm. Id.

During October, Det. Ginnetty observed Di'lon Smith pull into the driveway of 177 Megan Rd., enter the backyard, and spend time in the rear of the property. Id. at ¶ 5. Based on this, Ginnetty and his colleagues began to monitor the address, and observed Di'lon Smith enter and leave the property on numerous occasions, allegedly driving to short meetings with individuals then returning to the property. Smith allegedly would scan the street upon entering and leaving the property and would sometimes drive past the driveway and turn around before parking, which Ginnetty interpreted as evasive or countersurveillance efforts. Id. Based on this, and detectives general "experience" regarding the practices of drug dealers, Ginnetty began to suspect that 177 Megan Road was being used as a "stash house" for contraband. Id. at ¶¶ 4, 5.

In November, a Yarmouth PD Detective, "Lundegren", informed Ginnetty that he had a confidential source ("CS3"). Id. at ¶ 6. Lundegren relayed to Ginnetty that CS3 had identified

---

[4] Di'lon Smith allegedly sold for $150 per gram.

177 Megan Road as Di'lon Smith's new residence, and that Smith was using the address as a stash house for narcotics. Id. CS3 also noted that Smith was renting the basement of the house and entered the building via a rear door. Id. No information was provided as to when CS3 had been to the house, how the source was aware of the information, or any information regarding the source's reliability or prior efforts, successful or otherwise, on behalf of law enforcement.

During the week of November 18th, Ginnetty's colleagues, Det. Cunningham and Chevalier, tasked their source, CS1, with conducting a controlled buy from Denzel Smith. Id. at ¶7. Chevalier and Cunningham met with CS1, who had already arranged a purchase of fentanyl with Denzel and provided the source with funds. Id. Chevalier searched CS1 and CS1's car for drugs, money or weapons, finding none. Id. Prior to Chevalier and Cunningham meeting with CS1, Ginnetty had observed both Di'lon and Denzel Smith being present at 177 Megan Rd. Id. Cunningham and Chevalier followed CS1 directly to the designated meet location in Barnstable, where Chevalier and another officer, Sgt. Butler, maintained surveillance. Id. At some point prior to the designated time, Ginnetty observed Denzel Smith leave 177 Megan and drive directly to the meet. Id. A short interaction between CS1 and Smith occurred, and Cunningham and Chevalier followed CS1 directly back to a pre-arranged meeting spot. Id. Once there, CS1 provided officers with a blue powder alleged to be fentanyl. Id. CS1 told the officers he'd purchased the drugs with the police-provide cash, and that the transaction occurred within Denzel's Impala. Id. It does not appear that police maintained surveillance on Smith after this meet, and did not observe if he returned to 177 Megan Rd., or drove elsewhere.

In the 72 hours preceding November 28th, 2017, Barnstable Police conducted a similar controlled purchase, targeting Di'lon Smith. Id. at ¶ 8. After confirming that Di'lon Smith's car was parked at 177 Megan Rd, Det. Ginnetty met with CS2 and instructed the source to arrange a

purchase of fentanyl. Id. CS2 subsequently made a phone call to arrange the sale, and Ginnetty stated that he recognized Di'lon Smith's voice[5] agreeing to the transaction and providing instructions as to where and when to meet. Id. Ginnetty confirmed that CS2 did not have drugs, weapons or money, and then provided CS2 with marked funds. Ginnetty followed CS2 directly to the designated meeting location. Id. Det. David Foley observed Smith's car back out of 177 Megan Road, and travelled directly to the designated meet. Id. De. Ginnetty subsequently observed Di'lon Smith meet with CS2 and conduct what appeared to be a transaction. Id. Ginnetty then followed CS2 to a meeting spot, where CS2 turned over purported drugs, which CS2 said were purchased from Di'lon. Id. CS2 and the car were searched for drugs, money, or weapons and none was found. Again, it does not appear that Smith was followed following the transaction, and it is not clear whether he returned to 177 Megan Rd.

None of the controlled purchases occurred at 177 Megan Road. Neither CS1 nor CS2 apparently ever entered 177 Megan Road, or alerted officers that they knew it to be the Smith's residence. CS3 – who alleged that 177 Megan Road was being used as a "stash house" – asserted that Di'lon Smith had recently moved to the home, was renting the basement apartment, and used an entrance at the rear of the building to enter and leave. There is no explanation in the affidavit for CS3's basis of knowledge, or information on which to gauge the source's veracity. None of the informants ever alleged to have purchased drugs at 177 Megan Road. None of the surveillance notes produced by law enforcement during the investigation record any drug transactions occurring at the property.

A.  The Reliability and Veracity of the Confidential Sources

---

[5] Ginnetty attributed this to his prior interactions with Smith.

As noted above, the affidavit relies in part upon two primary sources, and one second-hand source. CS1 was described in search warrant affidavits as a person with whom the local police were familiar, and knew how to contact, but offered no indication of prior work for the police or reliability. Id. at ¶2. CS1 was an individual who has used and sold drugs in the past and has admitted to purchasing drugs for other individuals." Id. at ¶ 2. CS2 was similarly described as a person know to Ginnetty as a user and seller of narcotics. Id. at ¶3. Ginnetty, however, further considered CS2 a "reliable informant", based on the source having conducted recent controlled buys for the Barnstable police in other matters, that had resulted in a successful arrest and conviction, and the confiscation of contraband. Id. There is little to no information provided about CS3. CS3 was not, apparently, a Barnstable source – rather the informant was being handled by a Yarmouth Detective. Id. at ¶ 6 It does not appear that Ginnetty or any of his Barnstable colleagues had any face-to-face meetings with this individual, rather information from the source was passed to Ginnetty indirectly via the Yarmouth detective. Id. No information regarding the source's reliability or explaining CS3's basis of knowledge was included in the affidavit. Id.

B. The Search of 177 Megan Road, Di'lon and Denzel Smith, and Cars Parked on the Property.

Shortly after 2 p.m. on November 29th, 2017, law enforcement executed the search warrant at 177 Megan Road. At the time, Denzel and Di'lon Smith were present, along with Di'lon's girlfriend and an undisclosed male with whom Barnstable Police were familiar. All were standing in the driveway when police approached them. *Ginnetty Narrative of Search Warrant Execution*[6], *Bates 000103-04*. Denzel, Di'lon, and Di'lon's girlfriend cooperated with

---

[6] Attached as *Exhibit B*.

officers, although the unidentified male fled the scene, and was eventually tazed by Det. Chevalier in a nearby yard. Id. at 104.

In executing the warrant, police searched Di'lon and Denzel Smith. Id. Officers recovered two small bags of marijuana, a set of keys, an iPhone, an LG phone, and $779 from Di'lon Smith. Id. at 104-05. Police recovered a wallet, $24 cash, a folding pocket knife, a set of keys and an iPhone from Denzel. Id. at 105. From the apartment, police recovered a loaded .22 cal. revolver, a Heckler and Koch 9mm pistol, approximately 100 grams of suspected fentanyl in several bags, drug paraphernalia (scales, bags, etc.), as well as photographs, receipts and mail in Di'lon and Denzel Smith's names. Id.

Police also searched tow cars parked on the property. Police seized a Samsung cellular phone from the center console of Di'lon's car. In a Honda Civic associated with Denzel's girlfriend, officers found a backpack, a grinder with residue, blue gloves, a bag of Mannitol, baggies, a powder that was field tested as MDMA, and a box that police believed to be that case for a narcotics press. Di'lon and Denzel Smith were subsequently arrested.

## **ARGUMENT**

I.   **THE AFFIANT FAILED TO SET FORTH SUFFICIENT PARTICULARIZED FACTS WHICH WOULD PERMIT THE MAGISTRATE TO BELIEVE THAT CONTRABAND WOULD BE FOUND AT 177 MEGAN RD.**

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their … houses … against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched…." This guarantee is critical to our society's continued freedom, as the First Circuit has recognized:

> Fourth Amendment rights "are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so

effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." *Brinegar v. United States*, 338 U.S. 160, 180 (1949) (Jackson, J., dissenting). "But the right to be secure against searches and seizures is one of the most difficult to protect. Since the officers are themselves the chief invaders, there is no enforcement outside of court.... Courts can protect the innocent against such invasions only indirectly and through the medium of excluding evidence obtained against those who frequently are guilty." *Id*. at 181. As Justice Scalia has written for the Court, "there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Arizona v. Hicks*, 480 U.S. 321, 329 (1987)

*United States v. Khounsavanh*, 113 F.3d 279, 285 (1st Cir. 1997).

In determining the lawfulness of a search, the Court analyzes the information provided in the "four corners of the affidavit supporting the warrant application." *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir. 1999). In assessing this information within the affidavit, the reviewing Court conducts the following determination of probable cause:

A warrant application must demonstrate probable cause to believe that (1) a crime has been committed – the "commission" element, and (2) enumerated evidence of the offense will be found at the place to be searched – the so-called "nexus" element. With regard to the "nexus" element, the task of a magistrate in determining whether probable cause exists is to make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999) (citations and internal punctuation omitted).

Further, in determining the sufficiency of an affidavit supporting a search warrant, a Court must also consider whether the "totality of the circumstances" stated in the affidavit demonstrate probable cause to search the premises. *United States v. Strother*, 318 F.3d 64, 67 (1st Cir. 2003); *Feliz*, 182 F.3d at 88. ("[W]e do not suggest that, in all criminal cases, there will automatically be probable cause to search a suspect's residence…Rather, "[a]ll factors must be

8

weighed in each case in order to assess the reasonableness of inferring that evidence of the crime can be found at the suspect's home."); *United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970) (noting that "it cannot follow in all cases, simply from the existence of probable cause to believe a suspect guilty, that there is also probable cause to search his residence. If that were so, there would be no reason to distinguish search warrants from arrest warrants."); *United States v. Nolan*, 199 F.3d 1180, 1183 (10th Cir. 2000) ("We have never held that the mere observation of repetitive illegal drug activity outside a suspect's residence by itself is sufficient to establish probable cause for a search of the suspect's residence.").

Here, the affiant failed to demonstrate a nexus between illegal activity and the Defendant's home. *United States v. Zayas-Diaz*, 95 F.3d 105, 110-11 (1st Cir. 1996) (quoting *United States v, Fuccillo*, 808 F.2d 173, 175 (1st Cir. 1987). To meet this burden, the affiant must demonstrate, through particularized facts, that there was "a *fair probability* that contraband or evidence of a crime will be found" at the target location. *Zayas-Diaz*, 95 F.3d at 111 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (emphasis in original). To establish a fair probability, "the facts presented to the magistrate [must]'warrant a [person]of reasonable caution' to believe that evidence will be found." *United States v. Bain*, 155 F.Supp.3d 107, 123 (D. Mass. 2015) (Talwani, J.). It is true that sometimes "the nexus between the objects to be seized and the location to be searched "can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime] ...." *Id.* (quoting *United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir. 1979)). Courts have held, however, "that probable cause to suspect that someone has committed a crime does not automatically give rise to probable cause to search that person's home." *United States v. Thompson*, 630 F.Supp.2d 138, 143 (D.Mass.2009). Additionally, when

an affiant relies on confidential informants to support a warrant application, a reviewing court must evaluate, *inter alia*, the veracity and reliability of the informants, and the basis of their knowledge. *Unites States v. Nocella, Sr.*, 849 F.2d 33, 39 (1st Cir. 1988) (quoting *United States v. Figueroa*, 818 F2d 1020, 1024 (1st Cir. 1987).

In this case, the affiant failed to demonstrate that the evidence of the drug transactions would be found at the target location. First, assuming there was probable cause to believe that Di'lon or Denzel Smith was involved in the alleged drug transactions, the officers failed to provide any direct evidence that the Defendant used 177 Megan Rd. to store narcotics, weapons, or proceeds of the crimes.

### a. The affidavit did not sufficiently establish firsthand knowledge that contraband or evidence of a crime would be found at 177 Megan Rd.

Law enforcement points to no direct observation of drugs or drug dealing occurring at 177 Megan Road to support the affidavit. Neither of the Confidential Sources involved in controlled purchases ever entered the apartment or, it appears, were familiar with it as the Smith's residence, and both suggested to investigators that the Smiths carried out their operations away from their home. The application's link between the Smith's activities and the 177 Megan Rd. address rests largely upon an allegation made by a third CI of unsupported veracity, that the brothers were using the apartment as a "stash house" and two instances where Denzel and Di'lon, respectively, appear to have left the apartment at some point before a controlled buy.

Though "[t]he nexus between the objects to be seized and the premises searched need not... rest on direct observation," such evidence holds significant weight when evaluating its validity. *United States v. Bain*, 155 F.Supp.3d at 123 (quoting *United States v. Feliz*, 182 F.3d 82, 88 (1st Cir. 1999). Such direct observation can include police surveillance showing the evidence is at the target location, *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016),

confidential informants asserting evidence is at target location, *United States v. Beckett*, 321 F.3d 26, 32 (1st Cir. 2003) and recorded telephone conversations placing the evidence sought at target location, *United States v. Christian*, 893 F.3d 846, 855 (6th Cir. 2018).

While circumstantial evidence can be used to justify a warrant, an affiant must offer more than just speculation about the nexus. *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993). In *Lalor*, for example, law enforcement obtained a search warrant for the defendant's home based on the allegations that he sold drugs to confidential informants outside of the house. *Id*. at 1580. The *Lalor* court noted the lack of police surveillance or testimony that drugs had been seen inside the residence. *Id*. at 1583. In suppressing the evidence found during the search, the court held that the "affidavit is devoid of any basis from which the magistrate could infer that evidence of drug activity would be found" at the target location. *Id*. at 1585.

Similarly, in *United States v. Christian*, 893 F.3d 846 (6th Cir. 2018), *vacated pending rehearing en banc*, the court found that the Government had failed to establish a nexus despite previous search warrants executed at the home, the defendant's history of drug convictions, drug sales near the home, tips about the defendant's recent drug dealing, and the seizure of drugs from someone near the home:

> (1) search warrants were executed for drugs at the Residence in the past, (2) Christian has a history of years' old drug convictions, (3) he engaged in one sale of drugs at the Residence eight months prior to the execution of the search warrant, (4) unidentified subjects of unknown reliability reported that Christian was selling drugs in the more recent past, and (5) a man with no known connection to Christian was found to be in possession of drugs after leaving "the area" of the Residence on the date of the search-warrant affidavit.

*Id.* at 864. In reversing the judgment of the lower court which had denied the motion to suppress, the Sixth Circuit held that "the affidavit at issue here fails to establish more than a

speculative connection between drug activity and the Residence at the time of the search." *Id*. at 865.

Like *Lalor* and *Christian*, the warrant in this case relies on similar speculation. The affidavit lacks direct evidence that the Smiths were conducting drug sales from the home or storing drugs or drug proceeds therein. Moreover, no inferences can be mined from the facts that are presented which could demonstrate the appropriate nexus.

For search warrants to be valid, courts demand far more. In *Bain*, for example, law enforcement conducted police surveillance prior to the search of the defendant's residence which showed drugs were physically present at the target location. 155 F.Supp.3d at 124-125. The surveillance revealed that: 1) the defendant had keys to the target location; 2) his car was regularly seen there late at night and in the morning; and, 3) when law enforcement went to arrest him as he left his house, he swallowed drugs. *Id*. Thus, the direct observation helped lead to this Court's determination that the defendant "had brought the contraband with him out of [the target location]." *Id*; s*ee also United States v. Joubert*, 778 F.3d 247, 252 (1st Cir. 2015) (sufficient nexus where eye-witness testimony indicated incriminating evidence would be at target location); *United States v. Beckett*, 321 F. 3d 26, 32 (1st. Cir. 2003) (sufficient nexus where reliable informants saw and reported that defendant kept notebooks detailing murder at target location).

Here, there was no direct observation to support the nexus between items to be seized and 177 Megan Road. None of the confidential sources reported purchasing drugs from the apartment. The information provided by CS-1 relating to the alleged distribution of heroin and/or fentanyl combination was that Denzel Smith conducted "his drug transactions away from his primary residence and meets his customers at various meet locations within the Mid-Cape area."

*Affidavit of Peter H. Ginnetty*, at ¶ 2. Similarly, the affiant claims CS-2 informed him that Di'lon Smith conducted "his drug transactions away from his primary residence and meets his customers at various meet locations within and around the village of Hyannis." Id. at ¶ 3. Neither informant mentioned that the property located at 177 Megan Rd. had: 1) any connection to either Denzel or Di'lon Smith or 2) that this property was being used as a "stash/trap house." In fact, their information that the Smiths conducted transactions away from their home can be fairly read to support the opposite conclusion.

There are no allegations that the officers who surveilled 177 Megan Road observed a steady stream of suspected customers entering and leaving the premises, or even a single suspected sale. Officers did not perform a trash pull that produced the usual indicators of drug activity (e.g., cutting agents, cut baggies or other packaging materials), or otherwise find corroborating evidence supporting the assumption that a drug operation was underway at the house. The one allegation that the brothers were using the apartment as a "stash house" comes from CS3, for whom no information on veracity was provided, let alone an explanation of how the source came by this information.

To support the request, the affiant describes to two controlled purchases, one with CS-1 and one with CS-2, in mid-to-late November to establish a link between the Smith's alleged drug sales and the 177 Megan Rd. property. *Affidavit of Peter H. Ginnetty* at ¶ 7, 8. In the first, during the week of November 18th, CS1 arranged to meet Denzel Smith in Barnstable to purchase fentanyl from Denzel Smith. Ginnetty was surveilling 177 Megan Road prior to the transaction and observed both Denzel and Di'lon Smith to be at the home. Id. at ¶7. Ginnetty followed Denzel Smith from 177 Megan Rd. directly to the prearranged meeting, where an alleged drug transaction took place. Id. Smith reportedly left the apartment "shortly" before the arranged

purchase, though the affidavit does not specify how much time this amounted to. Id.  Roughly a

week-and-a-half later, CS2 engaged in a similar transaction with Di'lon Smith. Id. at ¶8. Prior to

the controlled buy, one officer – Det. Foley – observed Di'lon Smith's car at 177 Megan Rd, and

set up surveillance on the car and home. Id. Det. Ginnetty met with CS2 and instructed him to

contact Di'lon Smith and arrange a drug purchase. Id. Det. Foley "observed [Di'lon Smith's car]

back out of the driveway at 177 Megan Rd., and travelled directly to the meet location." Id.

Ginnetty then observed what appeared to be a sale, which CS2 subsequently confirmed. Id.

In *United States v. Barnes*, 492 F.3d 33, 37 (1st Cir. 2007), the First Circuit noted:

> This court has repeatedly found … that when a defendant sells drugs outside his
> home, it is reasonable to conclude that there is evidence of his drug dealing activity
> in the home, particularly when the defendant is observed leaving the home
> immediately prior to selling drugs. *See*, *e.g*., *United States v. Dessesaure,* 429 F.3d
> 359, 368-69 (1st Cir. 2005) (noting that when the defendant sold drugs to a person
> from his car, the defendant "had just come from his apartment, making it likely that
> the drugs he sold ... came from the apartment"); *United States v. Feliz,* 182 F.3d 82,
> 86-88 (1st Cir.1999) (holding that where police only observed a defendant selling
> drugs out of his car, there is still probable cause to search his home, because his
> home was "a likely place to seek to find incriminating items").

Though at first blush this language appears to doom Smith's instant motion, a close

reading of *Barnes* and the cases cited therein reveals several factual differences that materially

distinguish those cases from the instant matter.

In *Barnes*, the residence that ultimately was searched underwent surveillance beginning

in January 2005, but the defendant, John Barnes, was not identified (by a confidential informant)

as a crack cocaine seller until April 2005. *Barnes*, 492 F.3d at 35. The *Barnes* opinion does not

offer comment regarding why the subject residence first came under law enforcement scrutiny

approximately three months before Barnes was identified as a suspect, but the fact of prior

surveillance provides reason to believe the residence was the scene of prior criminal activity.

Moreover, the confidential informant in *Barnes* told the search warrant affiant that, on May 12,

2005, the confidential informant had "observed a large quantity of crack cocaine in a coffee can inside" the residence, and this information was included in the search warrant affidavit. *Barnes*, 492 F.3d at 35. By contrast, in this matter, the search warrant affidavit neither suggests that 177 Megan had been under lengthy surveillance prior to application for a search – it appears to have been a matter of weeks, two months at most – nor, again, does the affidavit allege that drugs were actually observed within the residence.

The facts of *United States v. Dessesaure,* 429 F.3d 359, 368-69 (1st Cir.2005), can also be materially distinguished from the instant matter. In *Dessesaure* the police found traces of powder which "they thought (but did not test) to be heroin, on the garbage bags Dessesaure took to the trash from the apartment". Id. at 368. When Dessesaure was arrested he allegedly tried to mislead police about his address – which the affiant suggested indicated that "he had something to hide at the apartment". *Id*. And police suggested that Dessesaure drove erratically when returning from suspected transactions to his apartment. The affidavit stated that this amounted to countersurveillance to throw off anyone following him, again suggesting he had drugs in his apartment. Id. at 368-69.

In the instant matter, Ginnetty's affidavit contains no comparable indicia of illegal drugs being stored at the residence. Law enforcement either did not conduct searches of the trash discarded at 177 Megan Road, or conducted them and found nothing out of the ordinary within the searched garbage. Either way, the police cannot point to corroborating evidence of drug packaging and preparation, or drug residue itself, to support the contention that 177 Megan Road was a stash house. The Smith brothers did not take any apparent steps to conceal their residency there – both were apparently parking their cars in the driveway and near the apartment. There is

no allegation that either Denzel or Di'lon engaged in roundabout routes on the way to or from the arranged buys.

Moreover, in *Feliz*, the confidential informant advised the police he had been purchasing drugs from the defendant for approximately 12 years. *Feliz*, 182 F.3d at 87. This information sharply contrasts with the instant matter, in which the alleged controlled buys took place over the course of approximately two months, none of the informants appear to have offered information about having long-standing drug relationships with the Smiths, and the affidavit – unlike the *Feliz* affidavit – contains no allegation that Mr. Smith was a longstanding drug "trafficker" with substantial records, cash, and drugs to secret in his residence.

Without any specific evidence or observation that Mr. Smith or his brother engaged in drug-related activities from his home, the magistrate erred in finding that evidence of the alleged crimes would be found therein. Two controlled buys and an uncorroborated tip from a source of unverifiable veracity should not suffice to establish the necessary nexus.

**b. A law enforcement officer's opinion, based on his training and experience, cannot furnish the required nexus.**

Det. Ginnetty's opinion, based on his training and experience, cannot make up for the lack of a factual nexus to the premises to be searched. Instead, specific and particularized facts are required. *See e.g. United States v. Rosario*, 918 F. Supp. 524, 531 (D.R.I. 1996) ("To permit a search warrant based solely upon the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect."); *United States v. Gianelli*, 585 F.Supp.2d 150, 167 (D. Mass. 2008), *aff'd sub nom United States v. Albertelli*, 687 F.3d 439 (1st Cir. 2012) ("probable cause cannot rest entirely on a law officer's experience and training," though such opinion may be considered as part of the calculus); *United*

*States v. Kosta*, No. Crim. 12-10226-DJC, 2013 WL 5934030, at *5 n.5 (D. Mass. Oct. 31, 2013)

("Although training and experience can illuminate the meaning of certain facts, it cannot be the

substitute for a lack of probable cause"); *United States v. Schultz,* 14 F.3d 1093, 1097 (6th

Cir.1994) (an officer's training and experience "cannot substitute for the lack of evidentiary

nexus"); *United States v. Rios,* 881 F. Supp. 772, 775 (D.Conn.1995) (an agent's expert opinion

does not, by itself, establish the necessary nexus for a search warrant); *United States v. Gomez*,

652 F. Supp. 461, 463 (E.D.N.Y 1987) (affiant's "expert opinion that narcotics traffickers often

keep records in their residences ... does not alone provide probable cause to search."); *United*

*States v. Guay*, No. 01-54-P-H, 2001 WL 1571460, at * 10 (D. Me. Dec. 11, 2001) ("An officer's

opinion based upon his knowledge of the behavior and practices of child molesters, by itself,

does not furnish the requisite nexus between the criminal activity and the place to be searched.").

The proper purpose for which a judge may consider a law enforcement officer's training

and experience is to "illuminate the meaning of certain facts." *Kosta*, 2013 WL 5934030, at *5 n.

5. "However, this assertion presupposes the inclusion of facts in the affidavit for the law

enforcement officer to interpret." *United States v. Feliz*, 20 F.Supp.2d 97, 103 n. 7 (D. Maine

1998), *rev'd on other grounds*. Where no such facts are contained in the affidavit, the officer's

training and experience "cannot be the substitute for a lack of probable cause." *Kosta*, 2013 WL

5934030, at *5 n. 5. If the rule were any different, law enforcement agents, "[b]y way of expert

opinion ... could effectively eviscerate the rule that '[p]robable cause to arrest an individual does

not, in and of itself, provide probable cause to search that person's home or car." *United States v.*

*Guzman*, No. S5 97 CR 786 (SAS), 1998 WL 61850, at *4 (S.D.N.Y. Feb 13, 1998) (citing

*United States v. Santarsiero*, 566 F. Supp. 536, 538 (S.D.N.Y. 1983)); s*ee also Zurcher v.*

*Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that

the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought.").

For example, in *Rosario*, the court addressed the question of "whether the opinion of a government agent based upon her knowledge of the behavior and practices of narcotics dealers can, *by itself,* furnish the requisite nexus between the criminal activity and the place to be searched." 918 F. Supp. at 530. There, the affiant established that "Rosario participated in illegal activity," by noting, among other things, that an informant purchased cocaine from Rosario during a controlled buy. *Id*. at 529. In attempting to get a search warrant for Rosario's house, the affiant noted that "Rosario was observed at the Bourne Avenue address" on one occasion, and that the electricity for the home in question was in Rosario's name. *Id*. The court held that this fact led to a "reasonable inference that Rosario lived at 140 Bourne Avenue." *Id*.

Yet "the only allegations to support the inference that evidence of Rosario's alleged criminal activity would be found at the Bourne address are the conclusory declarations made by [the affiant] based upon her training and experience [of] how most drug dealers operate." *Id*. at 529-531. After acknowledging that the affiant had "extensive training and expertise," the court held that such training and experience cannot establish probable cause without particularized supporting facts. *Id*. at 531. In so holding, the court noted that "[t]o permit a search warrant based solely upon the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect." *Id*. (citing *Schultz*, F.3d at 1098; *Gomez*, 652 F. Supp. at 463); *see also United States v. Khounsavanh*, 113 F.3d 279, 285

18

(1st Cir. 1997) ("A *per se* rule is not appropriate in the context of protecting precious Fourth Amendment freedoms.").

The oft-cited *United States v. Feliz*, 182 F.3d 82 (1st Cir. 1999) is not to the contrary. In that case, the court made clear that it did "…not suggest that, in all criminal cases, there will automatically be probable cause to search a suspect's residence." *Id*. at 88. Instead, the court must look to the totality of the circumstances, which "*may* result in the inference of probable cause to believe that criminal objects are located in a particular place." *Id*. (emphasis added). Based on the particular facts in *Feliz*, as supported by the officer's training and experience, the court upheld the warrant. It did so because Feliz was a long-time drug dealer who only had access to one possible drug storage location. *Id*.

Yet *Feliz* represents the nexus floor, below which any warrant will fail, and the *Feliz* case had more evidence than the affidavit here. While the only possible location to store drugs in *Feliz* was the defendant's house, here there were multiple places where contraband could have been stored – indeed, the police sought search warrants for not just the Smith brothers' apartment, but of the apartments of Denzel and Di'lon Smiths respective girlfriends, each of who could have stored items related to the crime, and the warrant for 321 Mitchell Way specifically identified it as a suspected stash house. *Affidavit of Det. Thomas Chevalier*[7] ¶¶ 2-7, *Bates* 000115-19. Further, while the brothers were alleged to have participated in several drug sales away from the residence over the several weeks they lived at 177 Megan Rd., the length of his criminality is far from the twelve years found to be "continuous and ongoing" in *Feliz. Id*. at 87. If the Court were to uphold this warrant, it would lower the nexus bar beyond *Feliz*, instead approaching the *per se* rule that courts have routinely criticized.

---

[7] Attached as *Exhibit C*.

   **c.** **Information Provided by Confidential Informants failed to establish a fair probability that contraband or evidence of a crime would be found at 177 Megan Rd.**

Further weakening Ginnetty's affidavit, the information provided by the confidential informants would not provide "a *fair probability* that contraband or evidence of a crime" would be found at 177 Megan Road. *Zayas-Diaz*, 95 F.3d at 111. Here, the three informants' veracity regarding this critical point is not sufficiently established.

Where the primary basis for a probable cause determination is information provided by a confidential informant, the affidavit must provide some information from which a magistrate can credit the informant's credibility. *United States v. Barnard,* 299 F.3d 90, 93 (1st Cir.2002). "[A] probable cause finding may be based on an informant's tip so long as the probability of a lying or inaccurate informer has been sufficiently reduced." *United States v. Greenburg,* 410 F.3d 63, 69 (1st Cir.2005). In assessing an informants credibility, the Court applies a "nonexhaustive list of factors" to examine the affidavit's probable cause showing, which include, among others: (1) whether the affidavit establishes the probable veracity and basis of knowledge of persons supplying hearsay information; (2) whether an informant's statements reflect first-hand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable or practicable (e.g., through police surveillance); and (4) whether a law enforcement affiant assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information. *United States v. Tiem Trinh,* 665 F.3d 1, 10 (1st Cir.2011).

For CS1, the affidavit lays out little to support the source's probable veracity and basis of knowledge. CS1 is described as a known user and seller of drugs, but it does not appear that the Barnstable Police had used this person previously in an active investigative capacity, but rather

treated them as simply a source of rumor and information. Though the affidavit suggests that Ginnetty, from his professional standpoint, experience, and expertise, considered CS1's information significant, absent prior work for the department that verified the source's *bona fides*, the magistrate is effectively being asked to credit this person based on their immersion in the Cape-area drug demimonde. CS1 attributed familiarity with Denzel Smith to having purchased heroin and fentanyl from him recently, which lends credibility to CS1's statements about knowing that Denzel was in the business of selling opiates, at a certain quantity and price. But first-hand information relating to the Defendant's drug activity does not equate to knowing that the evidence of that activity would be found in Smith's home. In fact, CS1 did not appear to know where Denzel Smith lived, and further believed that Smith carried out his drug transactions away from home. Some of CS1's statements, as they relate to Smith's drug dealing, are later corroborated, via CS1's controlled buy from Smith, but – again – this does not bridge the gap between criminal activity and evidence of that activity at 177 Megan Rd., and the affidavit does not suggest that investigators sought other means to establish this necessary link, for example by conducting trash pulls at the residence to look for evidence of drug packaging.

CS2's credibility is somewhat more established, compared to CS1, as CS2 had previously worked for Barnstable PD as an informant, resulting in a single successful investigation. Like CS1, CS2's familiarity with the general Cape drug trade, and Di'lon Smith's purported role within it, is derived from first-hand experience as a user and seller of drugs in the area, including having purchased narcotics from Smith. CS2, like CS1, verifies some of his allegations by engaging in a controlled buy from Smith. Again, from Ginnetty's professional standpoint, CS2's information is significant. But, again, like CS1, the significance of CS2's knowledge is limited to Smith's role in drug activity in the area, not the more narrow question of whether Smith is using

his apartment at 177 Megan Rd. as a warehouse for contraband. Like CS1, CS2's knowledge on this point is essentially nil; he never tells Ginnetty or other investigators that he is aware of Smith's address, and – like CS1 – believes that Smith carries out his drug activities away from his residence. Thus, while CS2's veracity as a source is more reliable, the information he provides does not bootstrap its way to probable cause to search Smith's residence.

To connect Smith's drug activities and the apartment at 177 Megan Rd., Ginnetty relies overwhelmingly on CS3. CS3 is the source who claims to know that Di'lon Smith recently occupied the basement area of the house, that he enters and leaves via the rear entrance, and that – contrary to CS1 and CS2's belief – that Smith was using the apartment as a stash house. While CS3's statement is arguably the strongest link the affidavit contains to demonstrate nexus, this source offers the weakest indications of veracity or basis of knowledge of the three informants. Unlike CS1 and CS2, CS3 is not a Barnstable PD source: Ginnetty does not state that he, or any of his Barnstable colleagues, know this individual or have any past experience working with the source. The affidavit offers no detail regarding *how* CS3 has come by this information – is this person also a drug user or dealer, or a past customer of Smith's? Is CS3's information based on first-hand observation, and has CS3 actually been to 177 Megan Rd., or is the informant simply repeating scuttlebutt? The affidavit does not reveal any details about the interior of the house, or layout of the apartment, to suggest that CS3 had been inside. There is not information on whether this source has cooperated previously with law enforcement and, if so, how recently and with what degree of success. It is, frankly, not clear that Ginnetty ever actually *met* CS3; the source is described as an informant for a Yarmouth Detective, and the "According to Det Lundegren, CS3 stated…" language in paragraph six of the affidavit strongly suggests that Ginnetty is passing along second-hand knowledge.

Though the informant-derived material in the affidavit concededly supports probable cause to believe the Smith brothers were engaged in drug dealing, the information offered by the sources does not provide "a *fair probability* that contraband or evidence of a crime" would be found at 177 Megan Rd. *Zayas-Diaz*, 95 F.3d at 111. CS1 and CS2's knowledge of the Smith's drug activities does not connect the dots between this activity and the target location, and the basis of CS3's veracity is too thinly drawn to credit.

## II.   SMITH IS ENTITLED TO A HEARING TO EVALUATE THE TRUTHFULNESS OF THE AFFIANT'S STATEMENTS

Whether to suppress the evidence seized depends on whether there is probable cause to support the affidavit once any misleading statements are removed. *Franks v. Delaware*, 438 U.S. 154, 172 (1978). Though evidence seized through an objective good faith reliance on the warrant need not be suppressed, if the affiant misled the magistrate or the reliance on the warrant is not objectively reasonable, then suppression is appropriate. *United States v. Leon*, 468 U.S. 897, 920, 923 (1984). In this case, at least two statements in the affidavit were made with reckless disregard for the truth and were necessary for the finding of probable cause.

The Defendant has made a substantial preliminary showing that: (1) a false statement or omission in the affidavit was made knowingly or in reckless disregard for the truth, and (2) the false statement or omission was necessary to the magistrate's finding of probable cause. *Franks*, 438 U.S. at 155-56. The magistrate who issues a search warrant must have accurate information from which they can make a determination of probable cause. *See, e.g.*, *Aguilar v. Texas*, 378 U.S. 108, 114 (1964). False or misleading information, which is known to be false by the Affiant, or provided by the Affiant with reckless disregard of the truth, is deemed an unthinkable intrusion upon the authority of the magistrate. *United States v. Ruiz*, 822 F. Supp. 708, 712 (D. Kan. 1993), citing *United States v. Leon*, 468 U.S. 897, 914 (1984); *Franks*, 438 U.S. at 165.

Whether to suppress the evidence seized depends on whether there is probable cause to support the affidavit once the misleading statements are removed. *Franks*, 438 U.S. at 172. The statements in question here are found in paragraphs five and eight of Det. Ginnetty's affidavit.

In paragraph five, Det. Ginnetty describes seeing Di'lon Smith present at 177 Megan Road, on several occasions during the month of October, 2017. As a result of this, Ginnetty alleges that investigators began surveilling the property and Mr. Smith and observed him behaving suspiciously – as if to detect or evade surveillance – and to have left the property on several occasions to conduct short meetings with "individuals and immediately returning back to 177 Megan Rd. [...]". In short, the paragraph serves to link Smith with the target location, as well as to give focus to Ginnetty's suspicions that the address is being used as a "stash house". Paragraph eight describes the controlled buy involving CS2 and Di'lon Smith, in which Smith allegedly drives directly from 177 Megan Rd. to carry out the alleged drug transaction.

Surveillance notes[8] by Det. Ginnetty, provided as part of discovery[9], however, do not reflect *either* of these things occurring. While the contents of Det. Ginnetty's surveillance notes for a two-month drug investigation are remarkably slender – just three pages – the omission of either of these incidents – given their arguable importance during the investigation and their importance in the warrant affidavit – is glaring. Moreover, their absence is all the more notable given that the notes are not cursory in other regards. Ginnetty's surveillance notes memorialize seven separate surveillance dates in some detail, often cueing occurrences to precise times. For example, the controlled purchase described in paragraph seven of the affidavit appears in the notes. Yet there is only one entry for all of October – taking place on October 3rd, in locations other than 177 Megan Rd. There is no mention of Di'lon Smith at 177 Megan Road, or of

---

[8] Attached as *Exhibit D*.
[9] The notes were provided only after the defendants pressed for them in contested discovery motions.

Ginnetty or other officers surveilling him going from the property to short meets during that month.

Similarly, the controlled buy which occurred between CS2 and Di'lon Smith – occurring in the three days prior to Ginnetty drafting the affidavit in support of the search warrant, and arguably an important component in terms of demonstrating probable cause – does not appear <u>at all</u> within his surveillance notes. The final four entries in the notes reflect that the GPS for Di'lon Smith's car was granted on Nov. 22nd, that the was a shooting on Nov. 24th where Di'lon was implicated, and that his car was seen later at his girlfriend's house, while Denzel's vehicle was spotted at 177 Megan Road, and that this was further confirmed by GPS data from the tracking device, and that on November 26th, Ginnetty and Chevalier installed the tracking device on Di'lon's vehicle. Paragraph 8 of the affidavit identifies the time frame of the controlled buy with CS2 as "[d]uring the last 72 hours" which, given that the warrant application was dated on November 28th, 2017, would cover back to November 25th. One would expect a significant event within the investigation, particularly one involving CS2 – who was Ginnetty's personally-known source and had previously assisted the Barnstable police – to merit inclusion in Ginnetty's notes, at least in some detail.

Further, the surveillance notes contain details that, if they do not expressly contradict the details memorialized in ℙ 7, nonetheless suggest details were left out or drafted to create a different impression in the warrant affidavit. For example, in ℙ 7, Det. Ginnetty writes that "[s]hortly before the scheduled meet, Det. Ginnetty observed DENZEL SMITH leave 177 Megan Rd and drive directly to meet with CS1 in the Impala. Det. Chevalier observed CS1 meet with Denzel Smith at/in the vehicle. After a brief meeting Denzel Smith and CS1 parted company." The preceding creates an impression that Denzel Smith was the sole individual in

the Impala and was the driver. Ginnetty's surveillance notes, however, record that when Smith was preparing to go to the meet, "[t]he Impala passes 177 Megan Rd., and Denzel is observed exiting from the rear of 177 and utilizing his cell phone. Less than a minute later, the Impala comes back to 177 Megan Rd and Denzel gets into the passenger side of the Impala. The vehicle leaves and heads directly to Sea Meadow village." In the surveillance notes version, there is at least one other person in the car with Smith and, it would seem, that person was present during the sale to CS1.[10] The affidavit does not mention this person. CS1 does not apparently mention the third party to Dets. Chevalier or Cunningham. The presence of another person in the Impala creates the possibility that this person was the source of the alleged drugs, or had couriered the drugs from some location other than 177 Megan Road.

Finally, it is notable, that the characterization of Di'lon and Denzel Smith's drug activities, as described by informants, changes between the application Det. Ginnetty prepared seeking a GPS tracker for Di'lon Smith's car[11], and the affidavit for 177 Megan Rd., which he prepared 11 days later. In the GPS affidavit, Ginnetty cites information from two sources, CS1 and CS2[12] that Denzel and Di'lon Smith are "selling street level quantities of fentanyl within the Mid-Cape area." *Di'lon Bates 160, 162*. In the 177 Megan Rd. affidavit, however, the confidential sources now say that Di'lon and Denzel are "selling large quantities of heroin and/or fentanyl combination in the Mid-Cape area." *Ginnetty Affidavit* at ¶¶2,3. While it might

---

[10] The affidavit is not specific regarding the date of this controlled buy, describing it as occurring "during the week of November 18th". Counsel believes – based on similarities between the two accounts - that the controlled buy in ¶ 7 of the affidavit is the same incident as that described under "Surveillance of Denzel Smith and Dilon Smith, NOVEMBER14, 2017" in Ginnetty's surveillance notes. If this assumption is incorrect, then it would appear that neither of the controlled buys was recorded in the surveillance notes.

[11] Attached as *Exhibit E*.

[12] Again, there is some confusion if these are the same CS1 and CS2 from the 177 Megan Rd. affidavit. The details for CS2 seem identical, though there are some discrepancies between the respective CS1 in the two affidavits.

seem tempting to dismiss this as an editorial choice, or harmless embellishment, amending the description from "street-level quantities" to "large quantities" seems deliberate

The deliberately false and otherwise incorrect statements in the affidavit are analogous to the statements made in *Zavatson*. The affiant in that case stated that there was video evidence that showed the defendant committing the crime, when in fact there was video showing him elsewhere. *Zavatson v. City of Warren, Michigan*, 714 Fed. Appx. 512, 522 (2017). The court in *Zavatson* held that the affiant's deliberately false statements and intentional omissions in the warrant application were material to the Magistrate's finding of probable cause.

Here, the comparison of Det. Ginnetty's affidavit to his contemporaneous investigation notes raise the specter that at least two paragraphs – important paragraphs as they relate to linking Smith's criminal activity to the premises to be searched – were fabricated. The omission in *Zavatson* is analogous to the Affiant's omissions here regarding the presence of an apparent third party in the car with Denzel Smith during the CS1 controlled buy, an individual whose presence inconveniently undermines the conclusion that drugs purchased by CS1 necessarily came from 177 Megan Rd. Finally, there is the apparent promotion of Denzel and Di'lon Smith from "street level" drug dealers to "large quantity" dealers within a span of less than two weeks.

Once these various misleading statements are excised from the affidavit, little remains. Paragraphs seven and eight provide the direct link between the Smith's drug activities in the Mid-Cape area and the property at 177 Megan Rd, and without paragraph five, the link between the Smiths and the property is supported only by the word of CS3, the second-hand source of unverified reliability. Further, where a magistrate might question whether street-level drug sales merited the search of a house, or whether there was adequate reason to believe street level sellers

would keep their wares in their residence, the description of the Smiths as major players, moving large quantities of opioids was likely more compelling.

While the affidavit does establish that a crime has been committed, i.e. drug dealing, it failed to show that the search of 177 Megan Rd. would result in evidence of the alleged ongoing drug activity. Striking out the passages identified above, other than the confidential sources' familiarity with the Smiths as persons in the area who sold drugs, the affidavit does not put forth any additional facts that would lead a magistrate to reasonably infer that there was sufficient nexus between the Smiths' alleged crimes and their residence at 177 Megan Rd.

## III.    THE GOOD FAITH EXCEPTION DOES NOT APPLY.

"The usual remedy for seizures made without probable cause is to exclude the evidence wrongfully seized in order to deter future violations of the Fourth Amendment." *United States v. Syphers*, 426 F.3d 461, 467 (1st Cir. 2005). Where the Government seeks to avoid the consequences of an invalid warrant, it bears a "heavy burden" of proving that the good faith exception applies. *United States v. Kosta*, 2013 WL 5934030, at *7 (D. Mass. Oct. 31, 2013) (Casper, J.), citing *Syphers*, 426 F.3d at 468. While evidence seized through an objective good faith reliance on the warrant need not be suppressed, *United States v. Leon*, 468 U.S. 897, 920 (1984), the Supreme Court has identified four situations where police reliance on a warrant lacking probable cause is not in good faith:

> (1) when the Magistrate granted the warrant upon reliance on a deliberately or recklessly false affidavit; (2) if the Magistrate abandoned his or her judicial role and did not act neutrally; (3) where the warrant based on the affidavit was lacking in probable cause to render official belief unreasonable; and (4) if the warrant was facially deficient that no officer could reasonable believe it to be valid.
> *Id.* at 923.

In this case, exception (3) applies since no reasonable officer could believe that the warrant demonstrated the required nexus. *Leon* at 923; *United States v. Barrington*, 806 F.2d 529

(5th Cir. 1986) (sufficient information must be presented to the magistrate to allow that official to determine probable cause; her actions cannot be a mere ratification of the bare conclusions of others). The good faith exception does not protect law enforcement who, "were reckless in not including in the affidavit information which was known or easily accessible to them," or "simply did not take every step that could reasonably be expected of them." *United States v. Fuccillo*, 808 F.2d 173, 178 (1st Cir. 1987). Here, law enforcement had no direct evidence, and relatively little circumstantial evidence that anything of note would be found within 177 Megan Rd.

Instead, the affidavit relies upon the Smith's involvement in drug crime outside their home, claims by informants of dubious veracity, and the opinion of the affiant, which courts have routinely held to be insufficient. *Kosta*, 2013 WL 5934030, at *5 ("The mere fact that the Kostas moved out of their Arizona residence in February 2012 and relocated to Massachusetts does not mean that the locus of drug operation shifted to Massachusetts in the absence of any evidence…"); *United States v. Moran*, 349 F. Supp. 2d 425, 476 (N.D.N.Y. 2005) ("…[M]erely connecting Cook to the methamphetamine conspiracy is an insufficient basis for finding probable cause to search his residence."); *United States v. Weaver*, 99 F.3d 1372, 1379 (6th Cir. 1996) (refusing to apply good faith exception because of the "paucity" of facts in a "bare bones" affidavit, where informant told police that he had purchased marijuana from the defendant at his home). Moreover, As argued in part II above, the magistrate relied on a deliberately false affidavit to grant the search warrant.

A reasonable officer should have known that the warrant was fatally defective. Thus, the Government cannot rely upon the good faith exception to avoid the consequences of the invalid warrant it obtained to search the Defendant's home.

## **CONCLUSION**

For the reasons set forth above, this Honorable Court must suppress all the evidence derived from the execution of a search warrant at 177 Megan Rd.

Respectfully submitted,
DI'LON SMITH, a/k/a DILON SMITH,                    DENZEL SMITH
By his attorney,                                                      By his attorney,
*/s/ Jessica D. Hedges*                                             */s/ W. Jamiel Allen*
JESSICA D. HEDGES                                             W. JAMIEL ALLEN
BBO No. 645847                                                   Bar No. AZ024631
Hedges & Tumposky LLP                                      Assistant Federal Public Defender
50 Congress Street, Suite 600                               51 Sleeper Street, 5th Floor
Boston, MA 02109                                                Boston, MA 02210
(617) 722-8220                                                     617-223-8061
hedges@htlawyers.com                                       Jamiel_Allen@fd.org


### CERTIFICATE OF SERVICE

I, Jessica Hedges, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on February 25, 2019.

*/s/ Jessica D. Hedges*
Jessica D. Hedges